Good afternoon, Illinois Appellate Court, 1st District Court is now in session. The 6th Division, the Honorable Justice Sanjay T. Taylor presiding, case number 23-1908, City of Chicago v. Westforth Sports. Good afternoon. My name is Sanjay Taylor, I'm the presiding justice of the 6th Division of the 1st District Appellate Court. I'm joined today by my colleagues on the panel, Justice Michael B. Hyman and Justice Carl A. Walker. I see that there are a number of folks attending the argument this afternoon, if I can ask you to please mute yourself so that the attorneys can proceed with their questioning uninterrupted. At this point, I would like to ask counsel for the appellant and appellee to introduce themselves and for the appellant, please indicate how much of your 20 minutes you would like to reserve for rebuttal and then the appellee will have 20 minutes as well. So, if we can begin with the appellant. Good afternoon, Your Honor. My name is Priyanka Sen on behalf of the City of Chicago, and I would like to reserve 5 minutes for the rebuttal. Good afternoon. Thank you. And Mr. Rudd? Good afternoon, Your Honor. My name is Timothy Rudd on behalf of Westforth Sports. Okay, good afternoon, Mr. Rudd. Okay, Ms. Sen, we'll begin with you. May it please the Court. The Due Process Clause permits states to hear cases in their own courts when their residents are injured by out-of-state actors. Although a defendant must receive fair warning that it could face suit in a forum state, it does not receive a free pass when it acts through an intermediary or turns a blind eye as to the true nature of its actions. Here, the City's allegations and extensive jurisdictional discovery showed that Westforth is a sophisticated actor that repeatedly sold firearms to straw purchasers so that it could profit off of the legal market for firearms in Illinois just a short drive away. What are the key facts that were obtained through discovery that show the minimum context needed in this case? What evidence specifically are you pointing to? Yes, Your Honor, we are pointing to a range of evidence showing that Westforth knew it was engaging in these straw sales and that they were specifically going to Illinois. So I'll start with the first part, showing that Westforth knew it was engaging in these straw sales. Westforth was repeatedly trained by ATF on how to recognize straw sales, because as a federal firearms licensee, it's the first line of defense in stopping these. But Westforth would still ignore common indicators of straw purchasing, like an individual buying firearms in bulk or duplicative firearms or paying in cash, so that could go through with these sales. And jurisdictional discovery showed that Westforth employees would even encourage customers to correct their transaction forms if they first disclosed that they weren't actually buying the firearms for themselves. Another piece of evidence is that ATF, when it cited Westforth for engaging in straw sales, told Westforth to adopt procedures to stop them, like keeping a record of denied transactions. But instead of doing that, Westforth would actually rip up and throw away forms for these nine transactions. So this all goes to showing that Westforth knew it was engaging in straw sales. Now, as to the part that Westforth also knew these guns were headed to Illinois, Mr. Westforth himself testified in his deposition that he knew, following a Department of Justice sting in 2014, that straw traffickers were trying to buy guns from his store to traffic to Chicago. We have other evidence of knowledge as well. Mr. Westforth testified that Illinois law enforcement, including the Chicago Police Department, repeatedly contacted him about his customers and his sales. We have an export report from a former agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, or ATF, saying that in this specific highly regulated market, it's a well-known phenomenon that people go to states with weaker gun laws, like Indiana here, and buy those guns to traffic them to Indiana. It seems that they've only sold to people with an Indiana ID, Indiana driver's license, and so forth. So how are they expected to know that those people are going to allow those guns to be taken into Illinois? Yes, Your Honor, there's two categories of evidence that respond to this point. So the first is the same export affidavit that I was describing. He explains that that's how straw purchasing works. Someone who can present in-state ID here, Indiana, gives it to the gun seller so that they can buy guns on behalf of someone who doesn't. And we have evidence in the record showing that even though these straw purchasers were showing Indiana ID, Westforth knew that these were actually straw purchasers trying to buy guns for other people. So some of this evidence is what I explained about the multiple purchases. Just pause for a second, because you're saying that there's knowledge. And how does the city of Chicago know that there's knowledge? Yes, Your Honor, we know that there's knowledge because we were able to engage in jurisdictional discovery. Now, we also have allegations, and at this stage of the proceedings, our allegations must be taken as true. But we have jurisdictional discovery as well. So we were able to obtain Westforth's transaction records. And these showed that in many of these situations when they were engaging with straw purchasers, there were all these signs of straw purchasing that ATF has trained Westforth to recognize and that our expert explained are common indicators of straw purchasing. So take Daryl Ivory, for example. The transaction records show that Westforth sold him 19 guns, many of which were very similar or duplicative, just over the course of six months. And we also have the ATF training in the record that shows that when someone is buying multiple guns in bulk, they're staggering their visits so they can avoid federal reporting requirements. These are all signs of straw purchasing because the person is not keeping the guns for themselves. Westforth was trained on how to recognize this, but it still continued to sell guns for these individuals because it was becoming a trusted source for these straw purchasers. So that's just one example, but the record is repeating. But some people just love guns. Like, there are people who love cars. And some people question, well, you must be a criminal because you've got 10 cars. Well, some people just love cars. Jay Leno, a perfect example, someone who loves cars. He's not a criminal. Some people love guns. Your Honor, I think that could be, well, on the one hand, first, reasonable inferences must be drawn on our favor. But even setting that aside, I think that could be perhaps a more legitimate excuse if this was a one-off or two-off transaction. But we're not talking about a situation where perhaps one time a customer came and bought many guns. We have 53 different straw purchasers here that we've alleged that Westforth has engaged in. And these people are buying 19, 20, 21 guns. And it wasn't just many guns, Your Honor. It was duplicative guns for which the individual would have no purpose for. And this is where our expert affidavit, which is unrebutted, comes in. In the example Your Honor gave about cars, that's not as highly regulated market as in guns. In guns, these specific fact patterns about buying items in bulk, this is what our expert says, these are unique warning signs in these contexts. Because it's such a highly regulated product that when people go in and buy guns in bulk and they're similar, there's reason to know that they are not buying the guns for themselves. And, again, this was not a one-off transaction. This was over the course of many years with dozens of individuals. And Westforth. Senator, may I ask you for a second? Is it fair to say that your argument is really one of inferences? That is, based on the record that you presented to the trial court, a reasonable inference could be drawn that Westforth purposely acted to access the Illinois market through store purchasers. Have I correctly summarized your argument? Your Honor, I think partially. So we think the record itself shows that Westforth knew what it was doing or was deliberately avoiding knowing what it was doing because of the evidence that I've mentioned. There's no evidence that any particular purchaser was a straw purchaser. Rather, based on the highly unusual circumstances that Westforth should have strongly suspected that these were straw purchasers. Am I correct? So we do think there is individual evidence. So there's a Daryl Ivory example I mentioned. To the extent your Honor means there's no evidence that anybody admitted I'm a straw purchaser and Westforth sold them anyways, that's the case. But that sort of fact pattern isn't going to play out in this situation. And the Supreme Court has made clear that personal jurisdiction is a very realistic, in fact, sensitive analysis. But I do take your Honor's point that there could be inferences that need to be drawn in some of these situations. But we think any reasonable inferences, it's clear, must be drawn in our favor. Now, I do want to. Is there any evidence? I think you touched on this earlier, but is there any evidence of purchase attempts by Indiana residents that were denied on the basis that Westforth suspected they were actually straw purchasers? Yes. So there is evidence that Westforth denied some of these purchases, but then what they were supposed to do was keep a record of that denial. But instead, the ATF witnessed Westforth ripping up and throwing those forms away. And the reason that's problematic is because ATF wants Westforth to keep a record of these transactions so that if that same person walked back in the store the next day or a few days later, its employees would be able to identify this person as a straw purchaser. So, although there's some evidence. You said that there was evidence that there was certain transactions were denied. What evidence is that? Yes, Your Honor. The evidence was in the ATF report where it observed Westforth denying a transaction and then ripping up and throwing the form away. So it's in the context of destroying these forms when denying transactions. Is there any evidence that Westforth maintained a do not sell to list? They said that they kept a list of people. This is a deposition of that might seem suspicious, but they did not keep a list of people who they shouldn't sell to because their transactions were denied. And there is also evidence. Was there a list? Sorry, go ahead. Oh, I'm sorry, Your Honor. There is evidence of actually the opposite, that Westforth employees would encourage customers to correct their transaction forms if they first said, I'm not the true buyer of the gun. And I'd like to point, Your Honor, to one example in particular. For one straw purchaser, Mr. Reynolds, he first actually indicated on his form that he lived in Illinois, not Indiana. We read the brief. We're aware of that. So you said that there was I think you said that there's testimony that we maintain the list of people not to sell to. Was that list ever produced in discovery? Not to my knowledge, Your Honor. And the testimony was that this list was just based on, you know, as a little sticky note at the at the computer. This wasn't a record of denied purchases like the ATF directed Westforth to keep. And then there is also evidence that we cite in our brief that these forms were thrown away, contrary to ATF instructions. Now, I want to be mindful of my time. Just a second. Did the city ask for the form in discovery, though? You said it wasn't provided, but did you ask for it? I apologize, Your Honor. I'm not sure, but I can address that point on rebuttal if that's OK. But we do know that Mr. Westforth did testify that they were not they were not keeping a record of denied transactions like ATF specifically instructed it to do. So we do know that from the evidence. Just real quick on that issue, too. Under the law, are they required to? Was that just simply a request? They are required to not destroy the transaction forms. And then the request was about keeping a total list of people. But the reason ATF made this request is because Westforth has been repeatedly cited going back to 2002 for engaging in straw sales. So that's why this request came in. Westforth almost even lost its license twice for engaging in straw sales. But just to be clear, they're not the last clear that they're not required to keep that list. That's just something that they were asked to do. The law is cleared that Westforth is supposed to keep an eye out for straw purchasing and not engage in any transaction if there's reasonable cause. But they're not required to keep a list. Yes, Your Honor. We all agree that they shouldn't be destroying evidence. But you're clear also that they're not. Yes, Your Honor. I do agree. The reason I bring it up is because it was specific instruction from ATF in this unique context where Westforth had already engaged in straw sales. Now, I do want to answer any other questions the court has on straw sales. But I would like to also touch on our other bases for minimum context. Now, that's Westforth's direct sales to Illinois residents. Now, these included direct sales of illegal firearms, including assault weapons and low-quality handguns. And Westforth doesn't dispute that these occur or that these are purposeful availments. So the concern is about relatedness. And relatedness doesn't look to causation. So the city's complaint says that there are illegal firearms coming into Chicago from out of state and harming our residents. And it specifically says straw sales caused this harm. Now, the direct sales weren't implied as a cause, but they showed Westforth's willingness to violate the law so that it could sell firearms to Illinois residents. So in this way, they were still connected to our complaint. The question, again, is not one of causation, just of connection. The Supreme Court made that clear in forwarding order. Let's go to Mr. Westforth's affidavit, where in paragraph 21 he says, Westforth Sports currently does not sell firearms to Illinois residents, even if they come into Indiana and meet the requirements for a lawful purchase. Your Honor, so that refers to a policy change Westforth made during the course of this lawsuit. Westforth stopped selling to Illinois residents. It doesn't change the fact that Westforth did avail itself of the Illinois market. When it says currently, that means they were selling to Illinois residents.  And they knew they were selling to Illinois residents. Yes. They knew they had contacts with Illinois residents. Illinois residents are coming in there to buy. But purposeful availment or minimum context doesn't turn on these changes in store policies. Otherwise, of course, a defendant could purposefully avail Illinois for many years and then close its door in response to litigation. And the city would never be able to request damages based on this past conduct. That's what you're saying is happening here. Yes, Your Honor. But the fact that the store is closed doesn't change the fact that for many years it engaged in this conduct, injuring Illinois residents. And the city is seeking damages based on that past conduct. So this policy change doesn't change the fact that Westforth availed itself of the Illinois market. And that's what the minimum context analysis looks to. I want to briefly turn to the amendment issue. If there are no questions on the direct sales question. Do you have any case in the United States where this issue that we are presented with has been decided one way or the other? So if Your Honor is asking about straw sales specifically. Specifically the allegations in this complaint with regard to an out-of-state firearms license dealer selling to straw purchasers. So we don't have anything that mirrors the allegations here where the store was repeatedly selling firearms over many years. There is the B. Miller case that Westforth cites. That case is not on point. That was sort of more of a one-off transaction where the dealer didn't know the gun trafficker was headed to Illinois. In fact, the dealer actually called ATF and checked to make sure the sale was legal before going through it here. Here we, of course, have ATF repeatedly citing Westforth. We also have the Delahanty case. Now that's not about straw purchasing, but it is about guns. And it looks to both guns that arrived into the District of Columbia legally and illegally that were manufactured and distributed by the defendant. So that is in the gun context. But these other cases that we cite, like Russell and Burger King, are still extremely instructive here for the principles of purposeful availment and related to. None of those are unique to those contexts. This is a question of first impression. Apparently in the country is what you're saying as to the context involved in this case. Yes, Your Honor, to our knowledge. But that shouldn't preclude this court from using the principles. That's not my question. I want to know. I didn't find anything out there. Yes, Your Honor. So this is a question of first impression. And we have explained in our briefs, as Your Honors are aware of that, particularly in this context where conduct is off the table. You know, it's a wink and a nod. We're selling you firearms you're not supposed to have so that we can benefit and sell large amounts of firearms or whether just a few for legitimate purchasers. In this specific context, it's important that the general principles of purposeful availment, specifically through an intermediary, not be set aside. I want to be mindful of my time, but just briefly touch on the amendment issue with the court's permission. This court has made clear many times that amendment should be freely and liberally given. Their circuit court recognized that amendment wouldn't prejudice Westworth here, but it still denied amendment. That was error. We focus on many reasons of our brief. I just like to briefly address the Loyola factors. Now, as to the issue of timeliness and reasonable opportunities, the city sought leave to amend immediately in the hearing when the circuit court denied amendment. The circuit court directed us to file a written motion, and we did so less than a month later. That was timely under cases like Loyola, where the plaintiffs waited even longer to seek amendment, and the Illinois Supreme Court said it was timely and reversed the circuit court's decision. I also want to touch on the factor about what the decision originally was with prejudice. And, of course, the judge changed that later on, but how did that come about? It was that somebody that the defendants asked for that, or is that just something that the defendants asked for a dismissal with prejudice? And then, as your honor indicates, we sought a motion to modify their circuit court, recognize the dismissal should be without prejudice. And then it correctly applied Loyola factors, but in applying the Loyola factors, it made mistakes with regards to whether the amendments would cure the defects or whether they were timely, and it was a reasonable opportunity. So they invited the fact that you couldn't amend. I mean, that's what the effect is that you weren't permitted to amend, and they were kind of inviting it, even at the argument on the issue of jurisdiction. By seeking the dismissal with prejudice. Right. So I think that it shouldn't be read as inviting it because the law is clear in Illinois that dismissal for lack of jurisdiction should be without prejudice. Well, I understand, but then how could the judge enter it with prejudice if they were asking for with prejudice? I think the judge still had discretion to dismiss the case without prejudice, which is what it ultimately did. But again, it didn't do that. My question is why the judge didn't do the right thing at the beginning. I mean, the judge eventually corrected herself, but why the judge originally seems to have been contrary to the law in doing it with prejudice. It wasn't something that you invited. I'm just trying to find out whether. Oh, yes, your honor. I understand. So I think the reason the judge said she did it is because that's what the defendants asked for. And then when we had a hearing explaining what the correct law is in these situations where it's dismissal for lack of jurisdiction, the circuit court understood that the correct law was without prejudice. So it doesn't matter whether the defendants asked for with or without prejudice. And the circuit court also recognized that amendment would separately not prejudice West Forth, but it incorrectly deemed this amendment untimely. It also incorrectly ruled that our proposed amendments would not cure any deficiencies. Now, as this court has made clear any to the extent there's any doubt that should be resolved in favor of amendment. We propose two categories of amendments. One was adding the direct sales as a basis for our complaint. And the second was to add more allegations on the straw purchasing front. And these go to your honors questions today. So one set of allegations we explained was that and once in an instance, a store employee knew that someone was trying to buy guns to traffic them to Chicago. And Mr. Westford said somebody else needs to complete the sale anyway and give them a discount. That's not our problem. So this is a type of evidence or allegations. This court has just been asking about that shows that West Forth knew exactly what it was doing. And it went through with these sales anyways, to maximize the court, the store's bottom line. And so they would cure any concerns. Thank you, Miss. Do my colleagues have any more questions? Okay, thank you. Mr. Thank you, your honors. First of all, just as a procedural matter, there was a statement made earlier on that the allegations and the complaint have to be taken as true at this stage. This is not a motion to dismiss. It was initially filed as a motion to dismiss the judge ordered the jurisdictional discovery be taken and converted it to a motion for summary judgment, which is how it was ruled upon. And so I would argue that nothing that's alleged in the complaint that isn't backed up by actual evidence has to be given any weight at all at this stage. So, if the court doesn't mind, what's the standard of review then? Is it de novo? The standard of review will be de novo as to the question of law, whether or not the evidence here supports a finding of personal jurisdiction, specific personal jurisdiction. As to the question regarding the leave to amend, that's going to be a discretionary standard. Well, so, but you indicated that the motion to dismiss for lack of jurisdiction was converted to a summary judgment motion and summary judgment motion is usually reviewed de novo. Correct. Am I correct on that as well? Yes, your honor. Okay, thank you. If the court. Why shouldn't we just reverse I mean, before we get into the bigger issue, but the last argument that we just heard. It seems that our law in Illinois is very liberal with regard to amending. Yes, your honor. And that's called an amendment. And again, if a motion for summary judgment and not a, it was dismissed, no allowance to amend, it's kind of unheard of. And so, you know, it's now it's with prejudice. Why shouldn't based on all the factors. It, it seems they were, they were very prompt. And why on that basis alone since we reverse. Well, your honor for a couple reasons. First of all, we need to look at the nature of whether the judgment was final, I would argue that in a determination that there's no specific personal jurisdiction. The words with prejudice or without prejudice actually don't even matter. I would cite you to the case of shawl bobas versus casualty insurance 314 Illinois app 3562 essentially what they say is it's the effect of the ruling that determines its finality. For example, had they never moved to change with prejudice or without prejudice. The reason they gave for their motion was they didn't want there to be any confusion as to the status of the substantive claims underneath. But had they never moved that would have been an appealable order, because there was an order that said this case is done, you don't have a specific personal jurisdiction over these claims. So I would argue, first of all, that the judge should be given heavy deference here, because it isn't a pre final order it's a post final order. Now, looking at the factors under Loyola. The most significant factor that I see is the timing. This is not something that was promptly done we see probably that that's a conclusion. Well, how many weeks was it. Well, it was months. I mean, it was months, it was at least five, because this was argued in January of 2023. Now jurisdictional discovery was completed long before that anything that they would have seen or known or needed to think about had they wanted to bring completely different claims based on completely different transactions, they could have done in 2022. In January of 2023 during oral argument. Judge specifically asked the city to questions. Do you have claims based on direct sales of long guns to Illinois customers that are purchased at Westworth's Indiana store answer in the current complaint, the answer is no. That's your reading from your brief. Your honor actually just for the site so that the court can look to it it's 4448 48 v nine of the record, this is the transcript. The second time she was the second question was asked well what about sales to Illinois, FFL do you have claims based on those the answer was no. That was in January of 23. The court said I'm only going to rule on the complaint that's in front of me. The city waited until it got a ruling that it didn't like. And then it only it only sought to amend after the court had said, everything that you've put before me does not support on the claims that you've brought does not support jurisdiction. So they waited multiple months, I would argue, almost a year after they should have had a reason if they wanted to make this case about different. When did they file their motion with date. They filed the motion, I believe it was 30 days after the court denied, or rather the court granted our summary. So, so they very promptly. It's within 30 days of the order. You tell me where it says that you should file your motion before the judge decides how did they know. I mean, I find your response to my initial question, very misleading. Because what you are saying is, well, it doesn't matter the judge ruled on May 25 of 2023, and within a month, 30 days they asked to amend that's the proper procedure, as you know, is correct. Actually, your honor I disagree, I would say that what we're talking about now is the fourth factor under a loyal and not the first. No, no, no, we're talking about a ruling that hadn't been made yet. Why would they prematurely ask if they don't know if they're winning or lost. If you do that, that doesn't make sense. I say that in the rules that you have to lay all doesn't say that I don't see any cases in my own that says you should follow your motion before a judge rules. The fourth Loyola factor specifically addresses previous opportunities to amend the pleading. There's no question becomes whether the law should know where's the previous opportunity. When you recognize that you had facts that you could add to make the case about transactions, other than the 50 test, where is that the test that that's not what level of meaning. Yeah, I wasn't until they lost that whatever they want, why would they do that, tell me, your, your honor with with all due respect, if the purpose of the judicial process is to litigate the claims that are known, then waiting to see whether you win before you add the other claims instead of taking a second bite at the apple I don't think that there's anything in Loyola that encourages that at all and I would argue that the fourth factor that says that you should amend when you realize and have the opportunity to do it to suggest that the city did not have the opportunity to do it months before when they said hey we're going to do this, and just didn't. Right, what case, can you not argue that tell me what, how would that be any different than any other case where a judge takes time to write a very thorough decision. Well, your honor I would argue that in a personal jurisdiction case, I'm not sure that you're going to find one where someone said I'm angry about this. Wait until the court says well we don't have jurisdiction over that and then the plaintiff says okay well actually then I'm angry about that. The city here identified making that up. I mean, tell me a lot. Give me a statute, a rule, a case, your honor I can't do that. I know, because it makes it up but we would that we would even be here on that. Mr. Rob let me ask you, the city attached to its motion for leave to amend a proposed amended complaint, is that right? Yes, your honor. Did the trial judge indicate at the time when she denied leave to file the amended complaint that she had reviewed the allegations in the amended complaint and that even those allegations were insufficient to show that the court had jurisdiction over West Forth? Well, your honor, the issue would be, and I don't want to speak for the court and the court's transcript and opinion. Do you know the answer to that question? I don't know that she specifically addressed that. I would argue, however, though, that the claims, having negligence claims based out of different transactions and occurrences against the same defendant, having jurisdiction over one, and again, we've not even gotten to that point because we've not even done pleading on that, but having jurisdiction over one negligence claim or one or one nuisance claim doesn't confer necessarily jurisdiction over others as well. It would be no different than if I hit one person with my car in Indiana and they happen to be from Illinois, or if I went over to the Illinois person's next door neighbor and accidentally caught their barn on fire. You might have two negligence claims, but they're entirely different transactions or occurrences to suggest that the law would allow jurisdiction over the car accident just because there's another different negligence claim. There's no support for that. And so I don't think that it does remedy their problem when it comes to jurisdiction. What they have is, and I think the trial court is right on this, what they have is two different sets of facts and two different types of claims that they're upset about, any one of which they could arguably have brought in Indiana. Let me pivot for a moment to the jurisdictional issue. I asked the council for the city about this, and so the question to you is why can't a reasonable inference be drawn here that West Forth was working with straw purchasers to distribute guns in Illinois when it was aware of the long history of straw purchasers coming in from Illinois immediately across the border and had been cited by ATF for violating the law on straw purchasers or straw purchases, was required by ATF to attend remedial training on straw purchases, had been approached by law enforcement agencies regarding guns sold at its store numerous times and had numerous individuals make purchases under highly unusual and suspect circumstances, such as individual Blasingame, Reynolds, and Ivory. Why can't a reasonable inference be drawn in favor of the city here? The reason is that constitutional jurisprudence in the United States on due process as it relates to specific personal jurisdiction doesn't allow it. And the reason for that is nobody's arguing that people don't know that straw purchasing is a thing. ATF trains against it. We have in our brief evidence that we've actually assisted ATF on stings. ATF said people are going to come in, they're going to try to buy this. If it gets denied, go forward with it. We've got evidence of all that. Mr. Rudd, there's more here though. The city is arguing that West Forth had residents of Illinois to change their residency to Indiana so that they could complete purchases. And then on top of that, the city is arguing that they facilitated straw buying or straw purchases by accepting cash payments, ignoring the staggered sales, and also ignoring all the repeat sales. These are some of the arguments that Ms. Senn just made. I don't know if you want to respond to any of that. That seems a bit egregious to me. Yes, I would. So a couple issues. The first issue is that the question here isn't whether there were even straw purchases. That's a question too far. The question is whether or not there can be jurisdiction attached by the actions of others. And so what's, first of all, most important to understand is that. No, no, no, no, no, no. That's not the way that it was just framed. At least that's not the way Ms. Senn just framed it. It's not the actions of others. These are the actions of West Forth. The actions of West Forth in basically, again, ignoring the staggered sales, ignoring all the repeat sales. Ms. Senn mentioned earlier that, you know, 19 guns sold to one person. I mean, does that sound egregious? It does. So it's not. It's more than that. So the question then, and if I'm not answering your question, please tell me because I don't want to waste anyone's time. The question then becomes if these transactions were straw purchases, if they all were, all 53 of them in Indiana to Indiana residence, if they all were. Before you get to that, I'll let you come back to the straw purchasers. Well, we're talking about situations where a customer from Illinois comes into West Forth to purchase a gun, and they realize that you don't have an Indiana ID, so we can't sell you a gun. But here's what you can do. You can go back and you get you an Illinois, an Indiana ID, and you come back next week and we'll take care of you. That seems like what's. Your Honor, that's not, that has not been alleged. There has not been a single shred of evidence in the record. If they were, I guarantee you that the city would have pointed pointed you to it. There is nothing that says that that is a hypothetical that's based on nothing. So what I would argue is that for jurisdictional purposes, the only thing that matters is what West Forth does to take up to get a product to another state or what it directs. Right. This does not allow unilateral actions. And so I'm sorry, I can't see the names of the judges and I'm not familiar with you all. But one of the questions, one of the questions that was asked was, is this a issue of of first impression in jurisprudence United States? It's not. The Williams case involved the sale of over 150 guns of the same type of the same, much of which in cash to a group of individuals who had indicated that they were thinking about starting a federal firearms licensee in Columbus, Ohio, and maybe one in New York. And the New York Court of Appeals, their highest court says, doesn't matter what someone else says they might do. And there's Supreme Court jurisprudence on this as well. What I expect, assuming I expect this to go to Chicago, what I suspect, what I think might happen, literally, for the purposes of a due process analysis for subject matter jurisdiction. I'm sorry, for personal specific jurisdiction. The only thing that matters is what I do and what I direct, which is why the city is trying to make an argument here that there's some sort of a distributor relationship. The problem is at this stage, they don't have the evidence for that. They could have gone and talked to any one of these people who have been convicted for straw purchasing. Are you denying that there were any straw purchasers? Of course not. I'm not denying that there's no such thing. And you're not denying that the ATF did talk to them about it? ATF speaks at every compliance inspection and every application inspection with every firearms licensee about these issues. I understand. So they were well aware of the situation. That straw purchasing exists, yes. Yeah, well, that it exists at their store. Were there citations? Not with regard to any of these transactions. I said, were there any citations? There have been citations for not recognizing a straw purchase on a one or two that I can recall inspections over the course of what is now 54 years of holding a federal firearms license and continuing to hold one. So what evidence is there in the record that shows that your client had a policy in place with its employees with regard to looking out for potential straw purchasers? Earl Westforth talked about it. Every witness who talked about it. All I could see in his affidavit was conclusions. They were deposed. Is there anything else in the record? Is there anything in the record that shows a policy? Other than his affidavit, I do not believe the city put the witness depositions in the record. But, Your Honor, irrespective of that, that's not a jurisdictional question. What the court would have to do then would have to come to an analysis that allows jurisdiction by geographical proximity. No, that's not what I was talking about. Because the question is that what's the allegations in the complaint are that a substantial number of individuals from Illinois went to Indiana and it was their conduct was within the definition of what the Supreme Court has defined as a straw purchaser, United States Supreme Court. And that your client turned a blind eye, basically covered their eyes, their ears and their mouth. And therefore, that is enough under the law for the minimum contacts. You can't just say I'm not going to do anything about that. And that's what they're alleging that happened based upon the production of the undisputed affidavit of their expert. And what Your Honor will see, and it's in the record and it's been cited to in our brief, is that we have 53 transactions, every one of which provided an Indiana ID, every one of which was sold in Indiana. And interestingly, of the ones that have been prosecuted. That's not the answer. Of course they do. You're telling me what a straw purchaser is. That's the perfect definition. So of course that happens. So that doesn't get us anywhere. So the question is, there were indicia, as Justice Walker was indicating in his question, there was an indicia. And yet nothing happened. That is the issue. It's not. I know what his affidavits as well. Everybody was fine. Of course, that's the. Of course, nobody's going to come in and say, oh, I'm a straw purchaser. The real question, Your Honor. The real question for jurisdictional analysis is what evidence is there that West Forth Sports directed anybody to take anything to Illinois, or even knew that any of these individuals were from Illinois. Because they had an opportunity to take jurisdictional discovery. That's called willful blindness, as it's being proposed in the case law and in the briefs. Because they don't want to know. Am I being asked. The issue is they don't want to know. Am I being asked to address a new theory of whether or not someone can purposely avail themselves unintentionally and unknowingly of another state? Because, Your Honor, that would be not. No, but that's not what they're saying. I mean, it is what they're saying. I believe you're changing the question. No, I think what they're saying is that you absolutely did know. Your client did know or should have known. That is the standard they're using. Not what you're saying. Their standard is your client knew or should have known, based on the transactions, the number, and the fact that they were meeting consistently with ATF. With regard to problems, they knew about the great problems of their guns ending up in Illinois. And yet, what did they do? Apparently, you can't tell me about any policy. It says that the employees were instructed otherwise. I would cite you to two cases. Your Honor, I would cite you to two cases. The Jay McIntyre Machine Limited v. Nicastro, U.S. Supreme Court, 2011. Cited in our brief. It is the defendant's actions, not his expectations. It's the defendant's actions. Actions are two ways, okay? There's action and there's inaction. Those are the same thing. It's the same as acting. It's just a different way of doing it by not doing anything. The Eastern District of Pennsylvania, Your Honor, spoke to an issue very similar to this. And I know it's not binding authority, but it's federal court authority that is worth hearing. Because it's based upon the applicable standards. Even if a defendant knew or should have known. And we're not saying we knew or should have known. We're not conceding any of those things. Even if a defendant knew or should have known that its product would end up in Pennsylvania, that expectation is insufficient to establish specific jurisdiction. What we have is, is we have a product that is highly portable, will be moved. People move states. The firearms, any firearms dealer sells, especially if they've been in business for 19 years. What about Madison's allegation regarding the direct sales to Illinois residents? Is that just a fallacy? There's a couple issues there. One, none of those were pled in the original complaint. What they did was is they tried to add those allegations after the fact. That's why they want to file an amended complaint. Again, that would do nothing. That would do nothing with these specific sales. And they waited until two years into the litigation to even bring that issue up. But I would argue, from a substantive standpoint, there are fallacies in their allegations. For example, they allege that sales of certain products are illegal because they're banned where an individual lives. There's actually a case law, the Kalatomos v. Village of Morton Grove, 103 Illinois 2nd, 483, 1984, that specifically says localized municipality rules only apply within the municipalities. I can own something and keep it away from where it's not allowed to be possessed. So there are arguments, but I feel like it's premature to be arguing a complaint that's not even before the court. Mr. Rudd, if you could. That's the issue before us now. Yes, Your Honor. Whether or not there should be a complaint before the court. That's part of the question that we need to decide. Mr. Rudd, if you could wrap up in the next two minutes, and then we'll turn to Ms. Senn for the rebuttal. Absolutely. So with regard to the jurisdiction question, and the trial court I think got this right, the only issue that she was ruling on there was the issues that were before her on the pleading at that time. And literally months passed, and between when the city said, hey, we might argue some other issues, before she issued her ruling, months passed. And so the complaint before the trial court was simple. Do these sales in Indiana to individuals with Indiana driver's licenses or IDs in Indiana addresses, the ones that did get in trouble actually got prosecuted in Indiana, by the way. Do these sales confer personal jurisdiction over West Forth in Illinois? And our position, Your Honor, and I think the Supreme Court case law backs us up on this substantially, and so does the Williams case out in New York. Our position is that what West Forth does to get a product to a specific locality is the only thing. It can either take the product or send the product in, or it can require someone, direct somebody. This is where you get sales reps. This is where you get relationships with distributors. There's no evidence of that. These are unilateral acts of third parties, who happen to be criminals, by the way. Unilateral acts cannot confer specific personal jurisdiction of a third party over somebody else. The second issue, and I'm trying to wrap up quickly, Your Honor, with regard to the second issue, should this other complaint even be before the court? Your Honor, they did not timely seek leave to amend when they recognized the issue. It doesn't cure this specific jurisdiction issue as to the 53 transactions they complained about. If they wanted to proceed, we would be proceeding in two different locations or one if they went Illinois only or Indiana only. But nothing about that amendment changes the jurisdictional analysis as to these specific transactions. And the only reason why the trial court, why we are even here, there's no question that it was a final order, with or without prejudices irrelevant on a jurisdiction issue. There is no question that it was a final order. A trial court is not allowed, is not required to allow the gamesmanship that the city engaged in to wait and see how it went on their first bite of the apple and then try something else. The judge didn't countenance it, wasn't required to countenance it, and she is entitled to a broad discretion on that. And we believe that that should be upheld. Mr. Rudd, any more questions for Mr. Rudd? Okay, thank you, Mr. Rudd. Ms. Senn. Thank you, Your Honor. Just a few quick points. So, counsel said this is a summary judgment motion. That's simply incorrect. If you look at the circuit court's order at C4687, it was granting Westford's motion to dismiss. Westford's statement of the issue says this is an appeal from a motion to dismiss, so I simply don't know where the summary judgment standard comes from. In any event, it's de novo. So you're saying he's completely off base on that. He just totally doesn't know. I'm not sure, Your Honor, where that's coming from. If you look at the circuit court order, it is granting a motion to dismiss. So the standard we put forth in our brief about reasonable inferences must be drawn in our favor. Applies. The second point is that our amendment request was not a post-judgment motion, even looking at the substance of what the circuit court did. Their circuit court had said that the city could file a motion and applied the Loyola factor, so even the circuit court recognized that this is not a post-judgment motion. The third is, Justice Hyman, you were asking about changing or adding claims in a complaint. Section 2-616A itself says that an amendment can change or add causes of action. In Loyola, the plaintiffs were adding new counts in addition to new allegations. And the Illinois Supreme Court said that those would cure the deficiencies and that it was an abuse of discretion to deny the request for amendment. So although we disagree that we were adding new claims, there is precedent for doing so. The fourth point is that Mr. Rudd brought up B-Miller. I referred to it as a Williams case in my opening. That case is not on point here because there was no evidence that the gun seller was intending to serve the illegal market through the straw sales. Again, the seller there called ATF and made sure the sale was legal. It is a very different situation than the case we have here. My next point goes to the willful blindness point that Justice Hyman was discussing with Mr. Rudd. On page 24 of our opening brief, we list many cases in which courts have rejected that excuse in the context of personal jurisdiction. Because otherwise, a defendant like Westforth could try to be willfully blind as to the form state that it's reaching into to profit from and escape personal jurisdiction. Due process is not meant to be used as a shield in this way. So willful blindness is not an excuse. Finally, I would like to address the direct sales. Are you aware of any personal jurisdiction case grounded in willful blindness? I do not, Your Honor. So I'm not sure if there's one out there or is this an issue of first impression. But it is clear that, oh, I'm sorry. Yes, Your Honor, I do. On page 24 of our brief, we list several cases in which the defendant would deliberately try to keep itself in the dark or was turning a blind eye to the natural consequences of its actions. And the courts said that this is not a defense and it's not an excuse to avoid personal jurisdiction. And that's because if you are avoiding specific knowledge of what you're doing. So Westforth here wasn't asking the straw purchasers, are you taking the guns to Chicago, but are instead turning a blind eye or you knew, but you're not making it clear. You're still availing yourself of the forum state. And so it's fair for that forum state to bring you in and hear suit. And then the question of liability will be decided later. Mr. A distinction between actions that he argued that we have to look at Westport's actions. And your argument is largely predicated on Westport's inactions that it failed to act despite being in possession of information that was highly suggestive of straw purchases. So are these cases, are they grounded in inaction? You said that they're based on willful blindness. So are they similarly based on inaction by the defendant? Yes, your honor. So one example is the Barone case. So there are the defendant didn't direct the distributor to sell its product in any specific states. So there was that inaction, but the court said that the defendant could not pretend that it knew where the distributor was likely distributing its products. Here, the inaction is even more important because under federal law, Westport is obligated to stop these straw sales when it knows that there are signs of straw sales or reasonable cost. So simply by refusing to do so, that is a formative step to facilitate these straw sales. And then we have other evidence of action that I discussed earlier, such as asking customers to correct their forms. But the Barone case could be helpful here, your honor. And I just want to quickly mention as to the direct sales, we did not engage in any gamesmanship as to those amendments. We made it clear in our opposition brief, which was due six days after Westport finished producing documents about the direct sales, that we were going to seek amendments. So we were always up front with the court and with Westport and there was no gamesmanship there. In your opposition brief, in your brief in opposition to Westport's motion to dismiss for lack of jurisdiction, did you indicate that if the court were to grant the motion that he would be seeking leave to file an amended complaint? We indicated that we'd be seeking leave to file an amended complaint in either situation, your honor, and we reset this at the motion. But that was, that was, you're saying that that was stated in your response to the motion to dismiss? Yes, your honor. And the reason for that timing was because Westport only finished producing documents just six days before that brief was due. So we decided to meet the briefing deadline and make our intent clear to the court. And so there was no gamesmanship here, contrary to what counsel suggests. Anything else? That's it. We would ask the court to reverse the circuit court's orders. Thank you. Justice Taylor, I know it's not usually done, but I do have a question because it was just brought up by counsel that we may have been misled by Mr. Rudd with regard to the summary judgment issue. And I find that disconcerting, and I'd like him to have an opportunity to explain himself, considering that the order from Judge Quish states specifically it's a 619 motion to dismiss. And he said, factually, this was a motion for summary judgment. So I am a little confused and with your permission, if we could have a response to that and if there's anything, Mrs. Sinwood would like to say in response, just on that specific issue. Mr. Rudd. Sure, your honor. So this, this was filed as a motion to dismiss. The city said that it did not want to respond to it on the pleadings that wanted to conduct jurisdictional discovery. The court ordered jurisdictional discovery. We engaged in it over a period of a year. My question is about summary judgment.  The judge decided this. This is what you said. In a motion for summary judgment. I'm talking about discovery. I want you to tell me, you said to us specifically that this was a motion for summary judgment, not a motion to dismiss. It was decided as a motion for summary judgment. No, that's not what it says. You tell me why, where is that in the judge's order? According to the court grants defendant's motion to dismiss for lack of personal jurisdiction. Because it was filed as a motion to dismiss for lack of jurisdiction, but it wasn't decided on the pleadings. It was decided upon discovery, affidavits, evidence, it was decided upon deposition testimony. Do you understand a 619 motion in Illinois? I do understand a 619 motion. Okay, so it's possible to have that kind of discovery. So what you're saying, in your mind, it was a motion for summary judgment. Is that what you're telling me? It was decided upon. It was decided on the basis of evidence outside of the pleadings. That's permitted in 619. You realize that? I do realize that. Okay, so then it has nothing to do with a motion for summary judgment. That's what you said. Yeah, the standard is no different, but yes, it was decided upon. I find what you said very misleading because you said it was decided and you told us about the standard and the standard is different on a motion to dismiss than a motion for summary judgment. You were asked specific questions on that. And that is not accurate, is it? So, if it would be more clear, more precise, what is accurate is the statement that this was decided on the pleadings and the inferences have to be drawn on the pleadings. I don't believe is accurate. If I'm mistaken as a matter of law, the court is well able to correct me on that. But this is not decided on the pleadings at all. It was decided upon evidence. Thank you, Mr. Wright. Any more questions from the panel? Does Ms. Zinn want to respond to that at all? Zinn, do you care to make any further response? No, Your Honor. Thank you. Thank you. Thank you for your thoughtful arguments this afternoon. The case is submitted and the court will rule in due course.